**KAZEROUNI LAW GROUP APC**
Abbas Kazerounian, Esq. (249203)
ak@kazlg.com
Pamela E. Prescott, Esq. (328243)
pamela@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KENDRA TURNER AND MAGAN MCCULLOUGH, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**WESTLAKE PORTFOLIO MANAGEMENT, LLC,**<br><br>**Defendant.** | **Case No.:**<br><br><u>**CLASS ACTION**</u><br><br>**COMPLAINT FOR VIOLATIONS OF:**<br>  **I. FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. §§ 1692, *ET SEQ*.; AND,**<br>  **II. SOUTH CAROLINA UCC, SECTION 36-9.**<br><br>  **JURY TRIAL DEMANDED** |

1.    Plaintiffs KENDRA TURNER ("Ms. Turner" or "Plaintiff Turner") and MAGAN MCCULLOUGH ("Ms. McCullough" or "Plaintiff McCullough") (together, "Plaintiffs"), bring this action, individually and on behalf of all others similarly situated, for damages and injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant WESTLAKE PORTFOLIO MANAGEMENT, LLC ("Defendant") with regard to Defendant's predatory and unfair debt collection and business practices.

2.    Indeed, as alleged herein, Defendant intentionally, knowingly, and unfairly violated the: (1) Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.* ("FDCPA"); and (2) the South Carolina UCC, Section 36-9.

3.    In enacting the FDCPA, Congress's purpose was to eliminate abusive debt collection practices by debt collectors, to ensure debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged and to promote consistent State action to protect consumers against debt collection abuses.

4.    Plaintiffs make these allegations on information and belief, with the exception of those allegations that pertain to Plaintiffs, or to Plaintiffs' counsel, which Plaintiffs allege on personal knowledge.

5.    Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the named Defendant.

6.    Any violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such specific violation.

7.    All violations alleged regarding the FDCPA are material violations as these violations would limit the ability of a hypothetical least sophisticated debtor to

make an intelligent choice as to the alleged debt, determine whether the debt was owed, and the actions that should be taken to resolve the alleged debt.

## JURISDICTION AND VENUE

8.     Original subject matter jurisdiction is valid pursuant to 28 U.S.C. § 1331 because this case arises out of violations of federal law under the FDCPA, 15 U.S.C. §§ 1692, *et seq*.  Jurisdiction of this Court also arises pursuant to 28 U.S.C. § 1367 for supplemental jurisdiction over the state law claims.

9.     Personal jurisdiction and venue are proper in the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: upon information and belief (1) Defendant conducts business within this judicial district; (2) Defendant's principal place of business is located within this district at: 4751 Wilshire Blvd., Suite 100, Los Angeles, CA 90010; (3) Defendant is a California Limited Liability Company; and (4) Defendant is wholly owned by Westlake Services, LLC, which is also a California Limited Liability Company, with its principal place of business located within this district at: 4751 Wilshire Blvd., Suite 100 Los Angeles, CA 90010.

## PARTIES

10.     Plaintiff Turner is an individual (and natural person, as that term is used in 15 U.S.C. § 1692, *et seq*.), and at all times relevant, a South Carolina resident.

11.     Plaintiff McCullough is an individual (and natural person, as that term is used in 15 U.S.C. § 1692, *et seq*.), and at all times relevant, a South Carolina resident.

12.     Plaintiffs are each a person from whom a debt collector sought to collect a consumer debt, which was due and owing or alleged to be due and owing from Plaintiffs. Plaintiffs are each therefore a "consumer" as that term is defined by 15 U.S.C. §1692a(3).

13.     Upon information and belief, Defendant is a California limited liability company that functions as a national loan servicer and third-party debt collector.

14.     Plaintiffs are informed and believe, and thereon allege, that Defendant uses any instrumentality of interstate commerce or the mails for the principal purpose of which is the collection of any debts, and regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, and is therefore a debt collector under 15 U.S.C. §1692a(6).

15.     This case involves an "obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." As such, this action arises out of a "debt" as that term is defined by 15 U.S.C. § 1692a(5).

### FACTUAL BACKGROUND

16.     Plaintiffs each purchased a vehicle from U.S. Auto Sales, Inc. ("U.S. Auto Sales"), a Georgia based nation-wide car dealer formed in 1992, known for selling pre-owned vehicles.

17.     U.S. Auto Sales utilized the finance company, U.S. Auto Finance, Inc. ("U.S. Auto Finance") to finance the vehicles it sold, and serviced such loans through USASF Servicing, LLC ("USASF Servicing") (together with U.S. Auto Sales, "U.S. Auto").

18.     Consumers who purchased vehicles from U.S. Auto, also entered into a separate Vehicle Service Contact (that was not part of Retail Installment Contract), for warranty services ranging in price from about $2,000 to $3,5000, depending on the level of coverage selected. Upon information and belief, U.S. Auto had a policy and practice of adding this warranty coverage to nearly all of its auto sales.

19.     The Vehicle Service Contact provided various warranties and coverage for repair costs ranging from engine repairs, transmission parts, air conditioning, brakes, emergency towing, road service, and locksmith services.

20.     These Vehicle Service Contacts were entered into with the consumer and a third-party, DOWC Administration Services, LLC ("DOWC"), and the

associated service contract fee was often rolled into the auto loan with U.S. Auto.

21. This meant that when a consumer made a payment on their auto loan to U.S. Auto, they were *also* making a payment towards this separate service contract fee under their Vehicle Service Contact with DOWC. This also meant that U.S. Auto was required to remit payments to DOWC on behalf of the consumer for such Vehicle Service Contacts.

22. This type of warranty coverage was important to consumers, including Plaintiffs, since many of the cars sold by U.S. Auto were older, high milage and pre-owned vehicles.

23. Upon information and belief, this warranty coverage provided in the Vehicle Service Contacts also enhanced the sale of U.S. Auto's vehicles because consumers could feel safe purchasing a more at-risk vehicle knowing that they were also purchasing a protection plan.

24. Upon information and belief, U.S. Auto sold thousands of vehicles with Vehicle Service Contacts that were financed though U.S. Auto Finance or other lenders, or that were purchased with cash. *See* DOWC First Amended Complaint, Case No. 2:23-cv-03947-CCC-JSA (New Jersey District Court), Dkt. No. 10, at ¶ 1.

25. Indeed, U.S. Auto Sales "operated 39 dealerships across six states including Georgia, Florida, Tennessee, South Carolina, North Carolina and Alabama."[1]

26. However, upon information and belief, U.S. Auto began to fall behind on its payments to DOWC for the Vehicle Service Contacts. *See* DOWC First Amended Complaint, at ¶ 1 ("USA Sales collected funds for the sale of DOWC Products, from consumers and their lenders, but failed to remit the funds to DOWC to make the contracts effective, or 'in force,' for the consumer's motor vehicle repair

---

[1] ALIVE, *US Auto Sales shutting down its dealerships after abrupt closures, furloughs all employees*, (Apr. 23, 2023) https://www.11alive.com/article/money/business/us-auto-sales-closes-all-dealerships/85-2a85dc4e-5cfc-48f0-9f08-3bfd82fd6e6f.

coverage and other protection.").

27. This rendered the Vehicle Service Contacts illusory preventing consumers from being able to benefit from this service. This failure to remit the proper payment to DOWC, left thousands of consumers without the warranty services that they contracted for (and that many consumers were paying for as part of their monthly car payment). *See* DOWC First Amended Complaint, at ¶¶ 2-3.

28. Sometime during April of 2023, U.S. Auto Sales abruptly shut down all its business operations.

29. Indeed, in an email sent to all its employees and managers, U.S. Auto Sales stated, "Although we have been diligently working for some time, including over this weekend, with our private equity owner and lenders, we were unable to reach an agreement that will allow our retail and supply chain locations to remain open."[2]

30. The email further stated, "[u]nfortunately, this means that our retail and supply chain locations will remain closed on Monday, April 24, 2023, and for the foreseeable future."[3]

31. Then on or about May 22, 2023, Defendant was transferred U.S. Auto Sales' loan portfolio, which at that time had a "principal balance of $741,473,258."[4]

32. Westlake Financial issued a press release in June of 2023, explaining that Defendant "was named Servicer after the 39 U.S. Auto Sales dealer locations closed down in April. All loan servicing was previously managed by U.S. Auto Sales is now managed by [Defendant] including repossessions, remarketing, payment collection, and more."[5]

33. "Additionally, [Defendant] is also servicing charge-offs of over $195

---

[2] *Id.*
[3] *Id.*
[4] Westlake Financial, Westlake Portfolio Management BeginsServicing Loans for U.S. Auto Sales, (June 2023) https://www.westlakefinancial.com/2023/06/06/wpm_servicing_loans_for-_usautosales/.
[5] *Id.*

million in previous charged-off loans. . . .Customers should receive both letters & emails announcing the servicing transition to [Defendant]."

34.     However, when these debts were transferred to Defendant for servicing from U.S. Auto, this portfolio included funds that were supposed to be paid towards the Vehicle Service Contact, but such warranty services remained *inactive* due to the failure of U.S. Auto to remit payment to DOWC. *See* DOWC First Amended Complaint, at ¶ 4.

35.     On July 24, 2023, DOWC filed a lawsuit in the New Jersey District Court against U.S. Auto (and other related entitles) and named Defendant and its affiliates in the suit. *See* Case No. 2:23-cv-03947-CCC-JSA (New Jersey District Court).

36.     DOWC also alleges in the lawsuit that sometime in or around June of 202, DOWC contacted Defendant to inform it that money was owed on the Vehicle Service Contacts and that its collection of consumer funds associated with the U.S. Auto portfolio contained payments towards these inactive services. DOWC First Amended Complaint, at ¶¶ 98-102.

37.     Thus, Defendant was aware as early as June of 2023 (and likely before then) that it was illegally and unconscionably collecting debts from consumers that were not owed because the services under the Vehicle Service Contacts were not being provided.

38.     On August 2, 2023, Consumer Financial Protection Bureau ("CFPB") sued USASF Servicing for (among other violations) wrongfully repossessing vehicles. *See* Case 1:23-cv-03433-VMC (N.D. GA).

39.     U.S. Auto eventually filed for bankruptcy in the Delaware Bankruptcy Court on or about August 25, 2023. *See In re US. Auto Sales, Inc. d/b/a US Auto Sales., et al.*, Case No. 23-11251 (TH).

40.     In a filing from USASF Servicing in response to the CFPB Complaint, it was indicated that U.S Auto is not operating and "will not be (ever) – operating."

Case 1:23-cv-03433-VMC (N.D. GA), Dkt. No. 8, at ¶ 7.

41. However, Defendant has and continues to *knowingly* collect amounts not owed from thousands of consumers and has also adopted unscrupulous business practices by engaging in the illegal repossession of vehicles.

**FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF MCCULLOUGH**

42. On or about August 20, 2022, Plaintiff McCullough incurred a "debt" as that term is defined 15 U.S.C. § 1692a(5) to U.S. Auto.

43. Indeed, on or about August 20, 2022, Plaintiff McCullough purchased a 2017 Mitsubishi Mirage G4 (ending in VIN Number 7166) from U.S. Auto at one of its physical retail locations in Greenville, South Carolina located at: 2752 Laurens Road Greenville, South Carolina, 29602.

44. At the time of the purchase of the vehicle, Plaintiff McCullough was a resident of South Carolina.

45. Plaintiff McCullough's 2017 Mitsubishi had about 81,375 miles as of the purchase date and was a pre-owned vehicle.

46. At the time of her vehicle purchase, Plaintiff McCullough also entered into a Vehicle Service Contact with DOWC for warranty services, which was financed through her car loan with U.S. Auto in the amount of $2,795.

47. Indeed, Plaintiff McCullough's purchase agreement listed the cash price of the 2017 Mitsubishi as $13,895 and included a $500 infrastructure maintenance fee, a $2,795 charge for the Vehicle Service Contact, and a $40 registration fee, for a total cash price of $17,245.

48. The purchase agreement also reflected a $999.00 Gap Waiver and accounted for an $800 initial down payment and another $600 deferred down payment, for a total unpaid balance of $16,844.

49. Plaintiff McCullough financed the total unpaid balance of $16,844 (inclusive of the $2,795 charge for the Vehicle Service Contact) with U.S. Auto Sales at an APR of 19.93%, for a total amount of $28,839.

50.     Plaintiff McCullough was to pay $192.26 bi-weekly every other Saturday, starting October 1, 2022 for a total of 150 payments.

51.     Under the Vehicle Service Contact with DOWC, Plaintiff McCullough purchased a Level 2 coverage plan that was to last for a 24-month term from about August 20, 2022 through August 20, 2024.

52.     The Vehicle Service Contact was supposed to cover repair costs for the engine, transmission, drivetrain and A/C, among other items.

53.     In early 2023, the transmission in Plaintiff McCullough's 2017 Mitsubishi failed.

54.     During this time, Plaintiff McCullough contacted U.S. Auto regarding the issues with her transmission, and U.S. Auto instructed Plaintiff McCullough to obtain an estimate for the repairs to obtain coverage under the Vehicle Service Contact.

55.     In or around April of 2023, Plaintiff McCullough found out that U.S. Auto was closing its dealerships and Plaintiff McCullough had trouble contacting U.S. Auto by phone during this time.

56.     As a result, Plaintiff McCullough called DOWC to inquire about her warrant coverage under the Vehicle Service Contact.

57.     DOWC informed Plaintiff McCullough that U.S. Auto had never remitted the required payments to DOWC under the Vehicle Service Contact rendering her warranty inactive.

58.     As a result, DOWC denied Plaintiff McCullough's warranty claim, informing her she did not have an active warranty with DOWC.

59.     On or about May 8, 2023, Plaintiff McCullough took her 2017 Mitsubishi to a repair shop to obtain a quote for the repair. The quote Plaintiff McCullough received indicated that the cost (including labor) to repair the vehicle would costs $3,717.54.

60.     During this time Plaintiff McCullough was unable to use her vehicle

due to the issues with the transmission.

61. Then in May of 2023, Plaintiff McCullough was contacted by Defendant attempting to collect on the debt with U.S. Auto (which *included* the payments towards the Vehicle Service Contact).

62. Specifically, on May 22, 2023, at about 8:52 a.m., Plaintiff McCullough received an email from Defendant stating, "Welcome to the Westlake Portfolio Management family! We are here to make sure you have the best auto finance experience on your **2017 MITSUBISHI MIRAGE**."

63. The May 22, 2023 email further stated, "Westlake Portfolio Management, LLC is a debt collector and any information obtained will be used for that purpose."

64. Plaintiff McCullough immediately contacted Defendant to inquire about utilizing the warranty under the Vehicle Service Contact (that she had been paying for several months).

65. Defendant instructed Plaintiff McCullough to keep making her monthly payments to Defendant (which included payments towards the Vehicle Service Contact that was allegedly inactive) and to contact DOWC and U.S. Auto.

66. Plaintiff McCullough continued to attempt contact all three entities, but Plaintiff McCullough was never given a clear answer as to how she could obtain the benefits of the Vehicle Service Contact.

67. Plaintiff McCullough made 19 payments towards the car loan and the Vehicle Service Contact amounting to about $3,652.94.

68. During May and June of 2023, Plaintiff McCullough made at least a few payments directly to Defendant.

69. Then in or around July of 2023, Plaintiff McCullough allegedly fell behind on her monthly payments and started receiving collection letters from Defendant indicating that her account was past due.

70. Shortly thereafter, in or around August 26, 2023, Defendant repossessed

Plaintiff McCullough's 2017 Mitsubishi Mirage while Plaintiff McCullough was at work in Georgia.

71.    At the time of the repossession, Plaintiff McCullough was still a permanent resident of South Carolina, though she was attending school in Georgia.

72.    Such repossession occurred without any prior notice from Defendant.

73.    Plaintiff McCullough did not receive any communications from Defendant informing Plaintiff McCullough of her right to redeem the vehicle or the intended disposition of the vehicle.

74.    Plaintiff McCullough was forced to purchase a replacement vehicle following the repossession of her 2017 Mitsubishi.

75.    Even through Defendant had already repossessed Plaintiff McCullough's vehicle, Defendant continued to send past due collection letters until about September 30, 2023.

76.    Then, starting in or around October of 2023, Defendant started sending Plaintiff McCullough debt collection communications offering Plaintiff McCullough to settle the debt, despite the fact that her vehicle had already been repossessed a few months earlier.

77.    For example, on March 4, 2024, Defendant emailed Plaintiff McCullough stating, "Our records show that you currently have a balance of $15,156.64 on the above- referenced account. For your convenience, on behalf of U.S. AUTO FINANCE, INC, Westlake Portfolio Management ("WPM") is offering to settle this balance with a one-time payment of $3,031.33."

**FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF TURNER**

78.    On or about February 13, 2023, Plaintiff Turner incurred a "debt" as that term is defined 15 U.S.C. § 1692a(5) to U.S. Auto.

79.    Indeed, on or about February 13, 2023, Plaintiff Turner purchased a 2013 Mazda (ending in VIN Number 7170) from U.S. Auto at one of its physical retail locations in Georgia located at: 208 Bobby Jones Expressway, Martinez,

Georgia, 30907.

80. Plaintiff Turner purchased a pre-owned 2013 Mazda that had 79,247 miles on it at the time of purchase.

81. Plaintiff Turner was resident of South Carolina when she purchased the vehicle.

82. Plaintiff Turner recalls purchasing the Level 1 warranty coverage for a period of 24 months and believed at the time of the purchase of her 2013 Mazda that such warranty coverage was also provided under a Vehicle Service Contact.

83. As part of her purchase agreement, Plaintiff Turner paid a $1,300 down payment towards the 2013 Mazda, with a deferred down payment of $450, for a total of $1,750.

84. Plaintiff Turner kept up with her bi-weekly monthly payments (which Plaintiff Turner believed included payments towards the Vehicle Service Contact) until about May of 2023, which resulted in a total of six payments.

85. Then in May of 2023, Plaintiff Turner was contacted by Defendant attempting to collect on the debt with U.S. Auto.

86. Specifically, Plaintiff Turner received an initial communication dated May 24, 2023 from Defendant to her South Carolina residential address in an attempt to collect a debt.

87. This May 24, 2023 debt collection letter represented that allegedly as of April 30, 2023, Plaintiff Turner owed $17,731.93 towards her loan with U.S. Auto.

88. On or about June 24, 2023, Plaintiff Turner requested that Defendant produce her Retail Installment Contract and Vehicle Service Contact.

89. Part of the reason that Plaintiff Turner wanted Defendant to validate the debt was because there was a discrepancy regarding Plaintiff Turner's bi-monthly payment amount.

90. Plaintiff Turner was not provided with any documents from U.S. Auto following the sale of her car, despite requesting copies.

91.　Plaintiff Turner believed that her monthly payment was supposed to be about $300 a month, but Defendant reported a monthly payment amount of $199 to her credit report, and Plaintiff was also verbally told by Defendant the amount owed per month was about $472.

92.　Plaintiff Turner was also experiencing issues with her 2013 Mazda, which required repairs that were supposed to be covered by the Vehicle Service Contact Plaintiff Turner believed she purchased.

93.　On June 26, 2023, Defendant responded to Plaintiff Turner's email stating, in part, "Due to the recent transfer of accounts, we still have some pending documents from U.S Auto Group. A Debt validation letter has been requested and as soon as we have the retail installment contract and payment history uploaded on file, we will mail it to your address."

94.　Defendant also indicated in its June 26, 2023 email that:

> As for the warranty, U.S Auto Group terminated the warranty upon boarding therefore, we will not be able to help with any repairs. There are 2 types of warranties that came from them; one was paid by US Auto free of charge and one was paid to a 3rd party as part of the finance charge. Both are no longer valid. However, for finance warranty, we are working with the bankruptcy of trust on a potential refund for the unpaid portion of the warranty. As soon as we have your warranty details and we are able to come to a resolution, we will let you know.

95.　Defendant eventually sent Plaintiff Turner some documents on or about August 23, 2023, but Defendant continued to fail to provide Plaintiff Turner with the underlying financing documents (including the Retail Installment Contract and Vehicle Service Contact).

96.　Plaintiff Turner was therefore unable to accurately determine what her bi-monthly payments were on the loan.

97.　Then, towards on or about September 29, 2023, Defendant repossessed Plaintiff Turner's vehicle from her apartment complex parking lot located in South

Carolina without providing a right to cure letter or *any advance notice at all*.

98. Plaintiff Turner did not receive any communications from Defendant informing Plaintiff Turner of her right to redeem the vehicle or the intended disposition of the vehicle.

99. As of the filing of the Complaint, Plaintiff Turner has not been able to retrieve her personal items contained within the vehicle at the time of its repossession.

100. Plaintiff Turner was forced to purchase a replacement vehicle following the repossession of her 2013 Mazda.

101. Defendant is still reporting the tradeline associated with 2013 Mazda as having an unpaid balance of $19,695, despite the fact that Defendant repossessed the vehicle in October of 2023.

102. As alleged herein, Defendant collected, and sought to collect, an alleged consumer debt from Plaintiffs (and others similarly situated) despite Defendant's false representations concerning the legal status of the alleged debt, as Plaintiffs and those similarly situated do not owe the alleged debts resulting from the Vehicle Service Contracts. As a result, Defendant is in violation of 15 U.S. Code § 1692e(2).

103. Additionally, by knowingly collecting on debts not owed under the Vehicle Service Contracts, Defendant has also violated 15 U.S.C. § 1692f including subsection (1) by engaging in unfair or unconscionable means to collect or attempt to collect the alleged debt and attempting to collect an amount not authorized by agreement or permitted by law.

104. Defendant's knowingly collecting on debts not owed under the Vehicle Service Contracts, but representing such debts as due and owing also constitutes false, deceptive, misleading means to collect a debt and in violation of 15 U.S.C. §§1692e(10).

105. As a result of Defendant's conduct, Plaintiffs and those similarly situated have suffered out of pocket harm including: (1) making payments to

Defendant towards their Vehicle Service Contracts, when in fact, Defendant knew such contracts were inactive; (2) having their cars repossessed, without proper pre-repossession notice from Defendant, thereby preventing Plaintiffs and those similarly situated from being able to make informed decisions about the status of their loans and whether such loans could be reinstated in order to prevent repossession; and/or (3) failing to be informed of their right to redeem the car after repossession thereby preventing Plaintiffs and those similarly situated from being able to make informed decisions about the status of their cars and whether their loans could be reinstated prior to their vehicles being sold by Defendant.

106. Defendant's failure to alert Plaintiffs, both South Carolina residents at the time of the repossessions, of the method of intended disposition is a violation of S.C. Code §§ 36-9-613(1)(c) and 36-9-614(1)(A).

107. If Defendant intended to dispose of a vehicle by "public sale," Defendant failed to state the date, time and place of said public disposition as required under S.C. Code §§36-9-613(1)(e) and 36-9-614(1)(A).

108. Defendant failed to provide Plaintiffs with a "description" of how such a deficiency was to be determined as required under S.C. Code §36-614(1)(B).

109. Defendant also failed to properly disclose Plaintiffs' right to redeem the vehicle in violation of S.C. Code §§36-9-623.

110. Defendant further failed to provide the telephone number for Plaintiffs to call to learn about the amount required to redeem the collateral under S.C. Code §§36-9-623, as required by §36-9-614(1)(C).

111. Finally, Defendant failed to state that Plaintiffs, as debtors, were entitled to an accounting of the unpaid indebtedness and the charge, if any, for said accounting, as required by S.C. Code §§36-9-613(1)(D) and 36-9-614(1)(A).

112. In consumer goods transactions, a notification that lacks any of the above information required under South Carolina Code S.C. Code §36-9-614(1) is insufficient as a matter of law. *See* Uniform Commercial Code Comment, Note 1 to

S.C. Code §36-9-614.

113.   Defendant's practice and policy of not providing the required disclosures associated with repossessed vehicles thus violates South Carolina law.

114.   Under the UCC, "every non-compliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted." Uniform Commercial Code Comment, Note 4 to S.C. Code §36-9-625.

115.   Plaintiffs and all members of the Classes have been impacted by, and face continuing harm (including a material risk of harm to their interests) arising out of Defendant's violations and misconduct as alleged herein.

116.   As of the date of filing of this Complaint, Defendant continues to actively collect on alleged debts that are not owed.

117.   Upon information and belief, other consumers are facing a substantially similar harm as Defendant has a policy and practice of collecting debts not owed under the Vehicle Service Contracts and illegally repossessing vehicles.

## CLASS ACTION ALLEGATIONS

118.   Plaintiffs bring this action on behalf of Plaintiffs and all others similarly situated.

119.   Plaintiffs represent, and are a member of, the national FDCPA Class, pursuant to Fed. R. Civ. P. 23(b)(3), which is defined as follows:

> All persons within the United States who purchased a vehicle from U.S. Auto in which Defendant attempted to collect payments towards a DOWC Vehicle Service Contact within the one-year preceding the filing of this Complaint.

120.   Plaintiffs represent, and are members of, the Repossession Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(3) and/or (b)(2), which is defined as follows:

All persons with a residential address within the State of South Carolina whose vehicle was repossessed by Defendant within the four years prior to the filing of this Complaint and did not receive any of the following disclosures from Defendant: (a) notice of the method of intended disposition; (b) the date, time and place of said public disposition; (c) a description of how such a deficiency was to be determined; (d) notice of the right to redeem their vehicle; and/or (e) notice of entitlement of accounting.

121. The FDCPA Class and Repossession Sub-Class are together referred to as the "Classes."

122. Excluded from the Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.

123. Plaintiffs reserve the right to redefine the Classes, and to add and redefine any additional subclass as appropriate based on discovery and specific theories of liability.

124. The Classes that Plaintiffs seek to represent contain numerous members and are ascertainable including, without limitation, by using Defendant's records to determine the size of the Classes and to determine the identities of individual Class members.

**Numerosity**

125. The members of the Classes are so numerous that joinder of all members would be unfeasible and impractical. The membership of the Classes is currently unknown to Plaintiffs at this time. However, given that, on information and belief, that Defendant obtained an approximate $700 million portfolio from U.S. Auto containing many individuals who purchased the Vehicle Service Contact and because it is believed that Defendant has a policy and practice of illegally

repossessing vehicles, it is reasonable to presume that the members of the Classes are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

**Commonality**

126. There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class members. Those common questions of law and fact include, without limitation, the following:

a) Whether Defendant's conduct of collecting or attempting to collect debts not owed under the Vehicle Service Contacts violated FDCPA;

b) Whether Defendant sought to collect a debt in an amount not owed or unauthorized by law;

c) Whether members of the FDCPA Class are entitled to the remedies under the FDCPA;

d) Whether members of the FDCPA Class are entitled to an awards of reasonable attorneys' fees and costs of suit pursuant to the FDCPA;

e) Whether Defendant can satisfy the bona fide error affirmative defense, assuming such an affirmative defense is raised; and,

f) Whether Defendant provided the required notices under the South Carolina UCC in connection with the repossession of vehicles.

**Typicality**

127. Plaintiffs are qualified to, and will, fairly and adequately protect the interests of each Class member with whom they are similarly situated, and Plaintiffs' claims (or defenses, if any) are typical of all members of the FDCPA Class and Repossession Sub-Class, as demonstrated herein.

128. Plaintiffs represent and are members of the Classes because Defendant attempted to collect on an invalid Vehicle Service Contact from Plaintiffs that was not owed or authorized by law and because Defendant repossessed Plaintiffs' vehicles in violation of the UCC. Consequently, the claims of Plaintiffs are typical of

the claims of each Class member and Plaintiffs' interests are consistent with and not antagonistic to those of the other members of the Classes that Plaintiffs seek to represent.

129. Plaintiffs and all members of the Classes have been impacted by, and face continuing harm arising out of, Defendants' violations or misconduct as alleged herein.

**Adequacy**

130. Plaintiffs are qualified to, and will, fairly and adequately protect the interests of each member of the Class and Sub-Classes with whom Plaintiffs are similarly situated, as demonstrated herein. Plaintiffs acknowledge that Plaintiffs have an obligation to make known to the Court any relationship, conflicts, or differences with any members of the Classes. Plaintiffs' attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement.

131. In addition, the proposed class counsel is experienced in handling claims involving consumer actions and violations of the FDCPA and other consumer protection claims. Plaintiffs have incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each member of the Classes. Neither Plaintiffs nor Plaintiffs' counsel have any interests adverse to those of the other members of the Classes.

**Predominance**

132. Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members of the class. The elements of the legal claims brought by Plaintiffs and members of the Classes are capable of proof at trial through evidence that is common to the class rather than individual to its members.

**Superiority**

133. A class action is superior to other available methods for the fair and

efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable and questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes. Even if every individual member of the Class and Sub-Classes could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required.

134. Individualized litigation also would present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, conducting this action as a class action will present fewer management difficulties, conserve the resources of the parties and the court system, and protect the rights of each member of the Classes. Further, it will prevent the very real harm that would be suffered by numerous members of the Classes who will be unable to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage because they chose to obey the law. Plaintiffs anticipate no difficulty in the management of this case as a class action.

135. The prosecution of separate actions by individual members of the Classes may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members not parties to those adjudications, or that would otherwise substantially impair or impede the ability of those non-party members of the Classes to protect their interests.

136. The prosecution of individual actions by members of the Classes would establish inconsistent standards of conduct for Defendant.

137. Defendant has acted or refused to act in ways generally applicable to the Classes, thereby making appropriate final and injunctive relief with regard to members of the Classes as a whole. Likewise, Defendant's conduct as described

above is unlawful, is capable of repetition, and will continue unless restrained and enjoined by the Court.

138. The Classes may also be certified because:

    (a) the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards of conduct for Defendant;

    (b) the prosecution of separate actions by individual members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and,

    (c) Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Class and Sub-Class as a whole.

139. This suit seeks only damages and injunctive relief for recovery of statutory damages on behalf of Classes and it expressly is not intended to request any recovery for personal injury and claims related thereto.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")**
**15 U.S.C. § 1692, *ET SEQ.***
**[ON BEHALF OF PLAINTIFFS AND THE FDCPA CLASS]**

140. Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

141. The foregoing acts and omissions constitute numerous and multiple violations of the FDCPA.

142. At a minimum, Defendant collected, and sought to collect, an alleged consumer debt from Plaintiffs (and others similarly situated) despite Defendant's

false representations concerning the legal status of the alleged debt, as Plaintiffs and those similarly situated do not owe the alleged debts resulting from the Vehicle Service Contracts. As a result, Defendant is in violation of 15 U.S. Code §§ 1692e and § 1692f.

143. Defendant is also in violation of § 1692e(8) for reporting credit information which is known or should be known to be false, including inaccurately reporting the balance information on the accounts of Plaintiffs (and others similarly situated) which includes the Vehicle Service Contracts, and also, reporting an incorrect high balance after repossessing a vehicle.

144. As a result, Plaintiffs and the FDCPA Class seek an award of: (1) actual damages pursuant to 15 U.S.C. § 1692k(a)(1); (2) statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and, (3) reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3) from CRA.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF SOUTH CAROLINA UCC, SECTION 36-9**
**[ON BEHALF OF PLAINTIFFS AND THE REPOSSESSION SUB-CLASS]**

145. Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

146. The contracts between Plaintiffs and U.S. Auto (and those of similarly situated persons with U.S. Auto) was "chattel paper" as the term is defined under S.C. Code §36-9-102(a)(11).

147. The vehicles were "collateral" as the term is defined under S.C. Code §36-9-102(a)(12).

148. Plaintiffs and Repossession Sub-class members are "debtors" as the term is defined under S.C. Code §36-9-102(a)(28).

149. The vehicles constituted "goods" as the term is defined under S.C. Code §36-9-102(a)(44).

150. Defendant is a "secured party" as the term is defined under S.C. Code

§36-9-102(a)(73), including specifically in the asserted right to take collateral for non-payment of "deferred" down payments, or regular contract payments.

151.　The vehicles were used primarily for personal, family or household purposes and therefore the vehicles were and are "consumer goods" as the term is defined under S.C. Code §36-9-102(a)(23).

152.　Under S.C. Code §36-9-609 secured parties such as Defendant may take possession of collateral without judicial process if it proceeds without breach of the peace.

153.　Under S.C. Code §36-9-610, every aspect of the disposition of collateral, including the method, manner, time, place and other terms must be commercially reasonable.

154.　The repossession of the Plaintiffs' vehicles, and those of the other class members, was not commercially reasonable within the meaning of the UCC since Defendant failed to provide the statutorily required disclosures, as explained above.

155.　As a direct and proximate result of the above-described acts, Defendant is liable for all damages sustained by Plaintiffs and the Sub-class members.

156.　Under S.C. Code §36-9-625(c)(2), Plaintiffs and each Sub-class member have the right to recover actual damages or an amount not less than the credit service charge plus ten percent of the principal amount of the debt or the time-price differential plus 10 percent of the cash price.

157.　Plaintiffs and the Sub-class members are further entitled to and seek interest, costs, and attorney's fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and members of the Classes, prays for the following relief:

- That this action be certified as a Class Action, establishing the Classes and any appropriate sub-classes that the Court may deem appropriate;
- Appointing Plaintiffs as the representatives of the Classes;

- Appointing the law firms representing Plaintiffs as Class Counsel;
- Pre-judgment and post-judgment interest;
- Costs of suit;
- An award of actual damages pursuant to 15 U.S.C § 1692k(a)(1);
- An award of statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(B) and/or the lesser of $500,000.00 or one percent (1%) of the net worth of the Defendant pursuant to 15 U.S.C. § 1692k(a)(2)(B);
- An award of reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3);
- Actual damages or an amount not less than the credit service charge plus ten percent of the principal amount of the debt or the time-price differential plus 10 percent of the cash price pursuant to S.C. Code §36-9-625(c)(2);
- Injunctive relief pursuant to S.C. Code §36-9-625(a);
- Any other relief this Court should deem just and proper.

### JURY DEMAND

158. Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demands a trial by jury.


Dated: March 27, 2024                    Respectfully submitted,

                              **KAZEROUNI LAW GROUP, APC**

                              By:   s/ ABBAS KAZEROUNIAN
                                    ABBAS KAZEROUNIAN, ESQ.
                                    ak@kazlg.com
                                    ATTORNEY FOR PLAINTIFF